UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| ISIS PARKER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 4:14-CV-1302 (CEJ) |
| ) | |
| CAROLYN W. COLVIN, Acting ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

# MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

## I. Procedural History

On August 19, 2011, plaintiff Isis Parker filed an application for disability insurance benefits, Title II, 42 U.S.C. §§ 401 *et seq.*, with an alleged onset date of September 28, 2009, which she subsequently amended to November 13, 2009. (Tr. 115-21, 122-23). After plaintiff's application was denied on initial consideration (Tr. 60-61), she requested a hearing from an Administrative Law Judge (ALJ). (Tr. 75-76).

Plaintiff and counsel appeared for a hearing on January 25, 2013. (Tr. 29-59). The ALJ issued a decision denying plaintiff's application on February 28, 2013. (Tr. 8-27). The Appeals Council denied plaintiff's request for review on May 30, 2014. (Tr. 1-6). Accordingly, the ALJ's decision stands as the Commissioner's final decision.

## II. Evidence Before the ALJ

### A. Disability Application Documents

In her Disability Report (Tr. 140-54), plaintiff listed her disabling conditions as blindness in her left eye, high blood pressure, arthritis, residuals of right knee meniscectomy in 2009, history of transient ischemic attack in June 2011, episodic numbness of the left side, arterial plaque in the brain, diverticulosis and severe abdominal pain, abdominal/pelvic adhesive disease, and depression. She reported that she worked as a department manager for a grocery store from 1987 until her termination in September 2009. She also worked as a tax preparer between 2006 and 2009. She was prescribed medications for the treatment of hypertension, high cholesterol, and clot prevention. In December 2012 and January 2013, her additional medications included antidepressants, a stool softener, Ranitidine,[1] Motrin, and a nonsteroidal anti-inflammatory. (Tr. 191-93).

In a Function Report dated August 29, 2011, (Tr. 167-77), plaintiff stated that she lived in a house with her family. Her daily routine consisted of getting her six-year-old son ready for school, dropping him off at school, resting or attending medical appointments, picking her son up, helping him with his homework, and getting his dinner. Otherwise, she watched television. She prepared meals that could be heated in the microwave. The only chore she described doing was laundry, which she did once or twice a month. She was able to go out alone, drive and shop. Her hobbies included watching television and occasionally going to a show. She occasionally visited her aunt, but in general she spoke to people on the telephone. She wrote that she "stay[ed] home a lot" because "it takes a lot out of me to keep my house running." (Tr. 172). Her medical conditions reduced her ability to walk up

---

[1] Ranitidine is indicated in treatment of duodenal ulcer, GERD, and erosive esophagitis. See Phys. Desk. Ref. 1633-35 (65th ed. 2011).

and down stairs and to sit or stand. She also complained of fatigue and reduced energy. Plaintiff had difficulties with lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, climbing stairs, seeing, memory, completing tasks, and understanding. She could not lift more than 10 pounds or stand or sit for more than one hour. She could walk for 15 minutes before needing to rest for 20 minutes. She occasionally used a cane. She got along well with people but did not handle stress well. She worried about having enough money to take care of her son.

Plaintiff's friend, Kimberly Caruthers, completed a Third-Party Function Report. (Tr. 155-62). Ms. Caruthers watched movies with plaintiff 2 or 3 times a week. Ms. Caruthers stated that, as a result of knee and back pain, plaintiff no longer enjoyed playing with her son and granddaughter and was not able to bowl or play softball.

### B. Testimony at Hearing

Plaintiff testified that she graduated from high school and obtained certificates in the areas of real estate sales, dental assistance, certified nursing assistance, and tax preparation. She never worked as a dental assistant or in real estate sales. (Tr. 32-33). From 2006 through 2008, plaintiff worked part-time as a tax preparer in addition to her full-time work. (Tr. 163-66).

Plaintiff worked in a grocery store seafood department for 23 years and was an assistant manager for 15 years. Her responsibilities included supervising two people, keeping the inventory, ordering products, and organizing the coolers and freezers. She stood or walked for 7.5 hours of an 8-hour shift and lifted up to 50

pounds. Her work required her to be on her feet for the entire 8-hour shift. She stated that her job was terminated in 2009 after she had surgery on her right knee.

Plaintiff testified that she experienced pain and stiffness in both knees and had difficulty with walking and bending. She could stand or sit for about 30 minutes at a time before she felt pain shooting down her legs.[1] Her left knee was more troublesome than her right and was especially bad on cold days. She had had the knee injected once and took unspecified pain pills every day. She was using a cane on the day of hearing and testified that she generally used it every day, especially when her arthritis was aggravated by the weather.

Plaintiff also had carpal tunnel syndrome which caused pain, numbness and tingling in her hands. When she was not experiencing pain, she could easily lift as much as 2 gallons of milk; at other times, however, even lifting the phone caused pain. Her doctor had given her an injection but she needed to have surgery to address the issue. (Tr. 40-41).

Plaintiff testified about her other impairments: she was born without sight in her left eye. She had corrected vision in her right eye and was able to drive, read, and use a computer. Her high blood pressure was controlled by medication. In June 2011, she experienced a transient ischemic attack in which her entire left side, from head to toe, became numb for 15 minutes. She was hospitalized for three days. She continued to have episodes until August 2012 when a neurologist prescribed medication which stopped the episodes. (Tr. 45). Plaintiff also had abdominal adhesive tissue disease. She underwent surgery to alleviate the condition, but after

---

[1]During her testimony, plaintiff had to stand for a minute or two after sitting for about 10 minutes. (Tr. 37-38).

an initial attempt, her surgeon determined that he could not complete the procedure. Her condition caused abdominal pain which had been severe in the past but had improved significantly after she started taking a stool softener. At the time of the hearing, she experienced abdominal pain about twice a week and she simply lay down for an hour or so until it resolved. (Tr. 46-47). Plaintiff testified that before she stopped working she had experienced depression for which she occasionally took medication, but her condition became worse after she lost her job. Medication helped her symptoms but she still felt fatigued all the time. (Tr. 47-49). Finally, she experienced neck pain about twice a week for which she took Tylenol.

### C. Medical Records[2]

On September 3, 2009, plaintiff underwent an examination of her left shoulder in conjunction with a work place injury. (Tr. 427). On examination, she had minimal tenderness and "slow cautious range of motion." She had discomfort with an impingement maneuver. Plaintiff's physical therapist reported that she had made "some slow progress, but at times her complaints seem[ed] to be exaggerated or out of proportion." An MRI of the left shoulder was negative. (Tr. 419).

Also in September 2009, plaintiff sought treatment for pain in her right knee that had been present for about three weeks. Tramadol provided limited pain relief. (Tr. 609). The right knee was tender on palpation and with full range of motion. An MRI completed on September 23, 2009, showed moderate sized joint effusion and a

---

[2]The administrative record contains medical reports beginning in 1998. Plaintiff cites records starting in September 2009 and the court will likewise restrict its consideration of the record.

popliteal cyst. Other findings suggested a focal amputation and tear of the lateral meniscus. (Tr. 613). On November 11, 2009, Robert S. Kramer, M.D. completed arthroscopy and cartilage debridement of the right knee. (Tr. 216-17). The postoperative diagnoses included right knee lateral meniscal tear and Grade III and Grade IV chondromalacia. At follow-up one week later, Dr. Kramer prescribed physical therapy three times a week for a three-week period. (Tr. 226). Plaintiff underwent an initial evaluation for physical therapy, but stated that she could not afford the co-pay for future visits. She was given a home exercise plan. (Tr. 222). On December 16, 2009, plaintiff told Dr. Kramer that she had mild discomfort for which she was taking 600 mg of Ibuprofen twice a day. She also stated that she was going to physical therapy. (Tr. 225). Two weeks later, she told Dr. Kramer that her knee was significantly improved. Dr. Kramer noted that plaintiff no longer required physical therapy and could increase her activities as tolerated. (Tr. 224).

On July 29, 2010, plaintiff sought emergency treatment at Missouri Baptist Hospital for pain in her lower back and abdomen. (Tr. 296-97). On September 20, 2010, Donna L. Wenzelburger, WHNP, conducted a gynecological examination. Plaintiff reported that she was "stressed out" because she had lost her job of 25 years and could not find another. In addition, she was taking care of two small children and her mother, who had lung and rectal cancer. (Tr. 383). Jeffrey Mormol, M.D., evaluated plaintiff's abdominal pain on September 28, 2010, and recommended that she undergo a hysterectomy. (Tr. 385). On November 9, 2010, Dr. Mormol attempted to perform a laparoscopic hysterectomy but encountered extensive adhesions throughout her abdominal cavity and pelvis. (Tr. 281-82). He

determined that plaintiff required a more extensive procedure than had been planned and the procedure was halted.

On June 3, 2011, plaintiff was admitted to Missouri Baptist Hospital with complaints of chest pain and left-sided numbness. (Tr. 723). Plaintiff reported that she was experiencing numbness that started in her left foot and then radiated up her leg, trunk, arm, and face, all within a minute. (Tr. 739). On examination, plaintiff was neurologically normal. An MRI of the brain showed no evidence of recent infarction, mass or enhancing abnormality. However, there were prominent nonspecific changes throughout hemispheric white matter, predominately in the subcortical region. (Tr. 768). A chest x-ray showed mild cardiomegaly. (Tr. 740). A cardiac stress test was normal and plaintiff's chest pain "totally resolved." Plaintiff's left-sided numbness was attributed to a transient ischemic attack. (Tr. 723).

On June 24, 2011, Dave A. Rengachary, M.D., evaluated plaintiff's left-sided paresthesias. (Tr. 733-34). He noted that, following her hospitalization, plaintiff started taking an antiplatelet agent and medication to control cholesterol and blood pressure. She then had a recurrence of symptoms. Dr. Rengachary noted that plaintiff's recurrent paresthesias were suggestive of a TIA, but a full workup failed to show clear focal or explanatory lesion. On examination, plaintiff had full strength, normal muscle bulk and tone, and intact sensation and coordination. She was alert and oriented. Dr. Rengachary recommended that plaintiff take Plavix and noted that she was attempting to enroll in the patient assistance plan.

On July 15, 2011, plaintiff sought emergency treatment for persistent abdominal pain. (Tr. 699-701). Radiologic studies indicated that she had mild diverticulosis and an ovarian cyst. (Tr. 781, 783).

On July 27, 2011, Shawn L. Berkin, D.O., conducted an independent medical evaluation of plaintiff in connection with the August 2009 injury to her right knee. (Tr. 691-97). At the time of the evaluation, plaintiff reported that she experienced pain and swelling and that her right knee popped. She experienced pain when she climbed stairs, squatted or kneeled. She took Motrin for pain control. On examination, plaintiff's right knee did not display any swelling or joint effusion. Her gait was nonantalgic with normal stride and cadence. She had crepitus, tenderness and pain with various maneuvers, but there was no instability. Dr. Belkin opined that plaintiff had a permanent partial disability of 35% at the right knee. He recommended treatment with nonsteroidal anti-inflammatory medications and analgesics. He also recommended that she follow a home exercise program to strengthen the knee and improve her flexibility. He opined that she should avoid excessive squatting, kneeling, stooping, turning, twisting, lifting, and climbing. She should also avoid standing for extended periods and walking long distances and should take frequent breaks during exertion.

An MRI of plaintiff's cervical spine completed on August 5, 2011, showed mild broad lateralization of the C5-C6 disc of uncertain significance, a suggestion of "red marrow reconversion," and possible muscle spasm. (Tr. 729). Dr. Rengachary recommended that plaintiff undergo physical therapy to address mild disc

herniation. He directed her to follow up with her primary care providers regarding the clinical significance of the possible marrow conversion. (Tr. 728).

Plaintiff again sought treatment for abdominal pain in August 2011. (Tr. 795, 717). In October 2011, she complained of pain in her right wrist. X-rays showed a normal bony pattern. (Tr. 819, 838). In December 30, 2011, plaintiff reported to Jean Mueller, GNP, that she had substernal chest discomfort and occasional numbness and tingling in her left side. (Tr. 978-81). On examination, plaintiff's heart rate was normal with regular rhythm. She had no edema. Cardiologist Robert Kopitsky, M.D., evaluated plaintiff on February 2, 2012, c. (Tr. 929-30). He noted that she had not had a recurrence of significant chest pain and that her thallium stress test and echocardiogram were normal. His diagnostic impression was benign hypertension and pure hypercholesterolem. He did not recommend any further cardiac evaluation and he strongly urged her to lose weight.

On February 8, 2012, plaintiff was diagnosed with severe sleep apnea following a sleep study. (Tr. 849-50). Treatment with a CPAP machine improved her sleep. (See, e.g., Tr. 854).

At follow up on July 26, 2012, Dr. Kopitsky assessed plaintiff as stable from the cardiac standpoint. (Tr. 926-27). He noted that she had recurrent episodes of upper chest discomfort, but no exertional angina symptoms, palpitations, syncope, or symptoms of congestive heart failure. He recommended a repeat thallium stress test, but otherwise "made no changes in her excellent medical regimen." Also in July, she was determined to be as an appropriate candidate for bariatric surgery, pending approval by her insurance company. (Tr. 989-90). In October 2012, Dr.

Kopitsky determined that there were "no cardiac contraindications" to plaintiff undergoing bariatric surgery. (Tr. 1054).

An x-ray of plaintiff's left knee on August 8, 2012, showed mild to moderate three-compartment osteoarthritic changes and small to moderate joint effusion. (Tr. 984). Terry Boxdorfer, FNP, conducted an orthopedic evaluation of plaintiff's left knee on August 22, 2012. (Tr. 1061-64). Plaintiff reported increased pain, popping and swelling, which was attributed to a possible torn meniscus. However, an MRI on September 14, 2012, did not definitely show a meniscal tear. (Tr. 1101). There was evidence of a "tiny" popliteal cyst, moderate osteoarthritis with some joint-centered bone edema, and small joint effusion. On September 24, 2012, plaintiff received a cortisone injection to the left knee. (Tr. 1059).

A nerve conduction study on August 23, 2012, indicated that plaintiff had mild bilateral carpal tunnel syndrome. (Tr. 1092-94). Shawn Kutnik, M.D. described the results of the study and a clinical evaluation as "quite benign" and assessed plaintiff's symptoms as "very mild in nature." (Tr. 1057). Surgery was not indicated and a right carpal tunnel injection was administered.

### III. The ALJ's Decision

In the decision issued on February 28, 2013, the ALJ made the following findings:

1. Plaintiff met the insured status requirements of the Social Security Act through December 31, 2014.

2. Plaintiff had not engaged in substantial gainful activity November 13, 2009, her alleged onset date.

3. Plaintiff has the following severe impairments: hypertension, arthritis of the bilateral knees, status post transient ischemic attack, abdominal pain from adhesive disease and diverticulosis, obesity, sleep apnea,

degenerative disc disease of the cervical spine, and mild bilateral carpal tunnel syndrome.

4. Plaintiff does not have an impairment or combination of impairments that meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. Plaintiff has the residual functional capacity to perform the full range of sedentary work as defined in 20 C.F.R. § 404.1567(a).

6. Plaintiff is unable to perform any past relevant work.

7. Plaintiff was born on August 1, 1967, and was 42 years old, which is defined as a younger individual on the alleged onset date.

8. Plaintiff has at least a high school education and is able to communicate in English.

9. Transferability of job skills is not material to the determination because using the Medical-Vocational Rules as a framework supports a finding that plaintiff is not disabled, whether or not she has transferrable skills.

10. Considering plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that plaintiff can perform.

11. Plaintiff has not been under a disability within the meaning of the Social Security Act from November 13, 2009, through the date of the decision.

(Tr. 13-21).

## IV. **Legal Standards**

The Court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson

v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)). If, after reviewing the record, the Court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Court must affirm the decision of the Commissioner. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. § 423(a)(1)(D), (d)(1)(A); Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009). "Each step in the disability determination entails a separate analysis and legal standard." Lacroix v. Barnhart, 465 F.3d 881, 888 n.3 (8th Cir. 2006).

Steps one through three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. Pate-Fires, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five. Id.

"Prior to step four, the ALJ must assess the claimant=s residual functioning capacity (>RFC=), which is the most a claimant can do despite her limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. ' 404.1545(a)(1)). "RFC is an administrative assessment of the extent to which an individual's medically

determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, *2. "[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations." Moore, 572 F.3d at 523 (quotation and citation omitted).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002). This evaluation requires that the ALJ consider "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." Buckner v. Astrue, 646 F.3d 549, 558 (8th Cir. 2011) (quotation and citation omitted). "Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" Id. (quoting Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005)). After considering the seven factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the

claimant's complaints. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000); Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether a claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant work. Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. § 404.1520(f).

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

## V. Discussion

Plaintiff argues that the ALJ erred by determining that she has the residual functional capacity (RFC) to perform sedentary work without identifying her functional limitations or restrictions as required by Social Security Ruling (SSR) 96-8p.

The RFC should "identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis,

including the functions in . . . 20 C.F.R. § 404.1545[(b)]," which include "sitting, standing, [and] walking." Depover v. Barnhart, 349 F.3d 563, 567 (8th Cir. 2003) (alterations in original). "[A] failure to make the function-by-function assessment 'could result in the adjudicator overlooking some of an individual's limitations or restrictions.'" Id. (citing S.S.R. 96–8p, 1996 WL 374184, at *1). An ALJ must "specifically set forth the claimant's limitations, both physical and mental, and determine how those limitations affect the claimant's RFC." Pfitzner v. Apfel, 169 F.3d 566, 568 (8th Cir. 1999) (citation omitted). It is well established, however, that "an arguable deficiency in opinion-writing technique does not require [a court] to set aside an administrative finding when that deficiency had no bearing on the outcome." Owen v. Astrue, 551 F.3d 792, 801 (8th Cir. 2008) (citation omitted).

Plaintiff argues that the ALJ's RFC determination is improper because he did not explicitly set out the function-by-function analysis. Here, the ALJ determined that plaintiff was capable of performing the full range of sedentary work. He then engaged in a lengthy and thorough discussion of the evidence used to determine the RFC. As discussed in more detail below, the court finds substantial evidence supports the overall RFC determination. And, although it is preferable for an ALJ to make specific findings as to each function, the failure to do so does not necessarily indicate that the ALJ overlooked the functions for which he does not make specific findings. Lynch v. Astrue, No. 4:10-CV-01035NAB, 2011 WL 3943851, at *11 (E.D. Mo. Sept. 7, 2011) (citing Depover, 349 F.3d at 567 (8th Cir. 2003)).

The ALJ determined that plaintiff can perform the full range of sedentary work, which involves "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools" and "sitting,

[though] a certain amount of walking and standing is often necessary in carrying out job duties." 20 C.F.R. § 404.1567(a). A job is sedentary if the periods of walking or standing generally total no more than two hours in an eight-hour workday and sitting generally totals six hours in an eight-hour workday. See SSR 83-10, 1983 WL 31251, at *5.

In determining the plaintiff's RFC, the ALJ fully addressed plaintiff's musculoskeletal complaints, cardiac complaints, obesity, transient ischemic attack, sleep apnea, abdominal pain, and carpal tunnel syndrome.[3] In doing so, the ALJ considered plaintiff's allegations of disabling symptoms, the treatment record, and the objective medical evidence. (Tr. 16-18). For example, addressing plaintiff's complaints of disabling knee pain, the ALJ noted that she had undergone arthroscopic surgery for the right knee, after which she reported significant improvement. (Tr. 16-17). Subsequent physical examinations disclosed tenderness to palpation and crepitus with movement, but plaintiff had full strength and normal muscle tone, coordination, and reflexes. Although plaintiff reported increasing pain in her left knee, an MRI in 2012 showed only moderate arthritis with small joint effusion. Plaintiff's complaints of neck and back pain were similarly disproportionate to the results of clinical examinations and objective medical evidence. With respect to plaintiff's carpal tunnel syndrome, the ALJ noted that, in September 2012, an orthopedic specialist determined that her symptoms were "very mild" and described the clinical findings and examination results as "quite benign." With respect to her obesity, the ALJ noted that plaintiff had worked fulltime for many years at her current weight.

---

[3] Plaintiff does not challenge the ALJ's finding that her left-eye blindness, depression and anxiety were not severe impairments.

The ALJ also addressed factors adversely affecting plaintiff's credibility. In particular, he noted that plaintiff is the primary caregiver to two young children and is able to perform cooking, cleaning, laundry, and shopping. She also took care of her ailing mother for a period of time. The ALJ found that these activities require a significant amount of physical and mental stamina. (Tr. 18-19). At various times, physicians imposed temporary restrictions on lifting or carrying in order to accommodate acute injuries, but her treatment providers never identified any limitations that would preclude the performance of sedentary level work on a sustained basis.

The court finds that the ALJ's determination that plaintiff has the residual functional capacity to perform the full range of sedentary work is supported by evidence in the record as a whole. To the extent that the ALJ failed to make a function-by-function assessment, the error is harmless.

## VI. Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **affirmed**. A separate Judgment in accordance with this Memorandum and Order will be entered this same date.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 12th day of August, 2015.